IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

RoseMary Love                          :
P.O. Box 214
Harlem, MT 59526                       :

    and                              :

Lind Marie Bara-Weaver                 :
4845 Belle Terre Parkway C-8
Palm Coast, Florida 32137              :

    and                              :

Margaret Odom                          :
P.O. Box 143
Sardis, Georgia 30456                  :      Civil Action No. _____

    and                              :

Gail Lennon                            :
295 County Road 149
Lookout, California 96054              :

    and                              :

James Murnion                          :
Box 55
Shawmut, MT 59078                      :

ON BEHALF OF THEMSELVES AND ALL        :
OTHERS SIMILARLY SITUATED;

                              :

        Plaintiffs,

                              :

    vs.

                              :

DAN GLICKMAN, Secretary               :
THE UNITED STATES DEPARTMENT
OF AGRICULTURE                        :
14th and Independence Avenue, S.W.  :
Washington, D.C. 20250

                              :

Defendant.

_____:

**CLASS ACTION COMPLAINT**
**(FOR DECLARATORY JUDGMENT, REVIEW OF AGENCY**
**ACTION, VIOLATIONS OF EQUAL CREDIT OPPORTUNITY ACT,**
**AND OTHER RELIEF)**

_____

The representative and individual plaintiffs listed in the caption ("plaintiffs"), on behalf of themselves and all others similarly situated, complain of defendant as follows:

NATURE OF THE CASE

Since 1981, when processing applications for women, minorities and other protected farmers and ranchers[1] (hereinafter, collectively, "farmers") for farm credit and farm programs, (hereinafter, generally, "farm programs") defendant willfully discriminated against them. Loans were denied, provided late, or provided with less money than needed to adequately farm. Further, when, in response, plaintiffs filed (in writing or orally) discrimination complaints individually with defendant, defendant failed, although required by, _inter alia_, the Civil Rights Act of 1964 and the Equal Credit Opportunity Act, to investigate the complaints. For example, when women, minorities and other protected farmers and ranchers filed complaints of discrimination with defendant, defendant willfully either (1) avoided processing or resolving the complaints, (2) stretched the review process out over many years, (3) conducted a meaningless, or "ghost" investigation, or (4) failed to do anything.

These two acts:  (1) the discrimination in denial of the application to participate in the farm program and (2) the failure to properly and timely investigate the discrimination complaints, deprived women, minorities and other protected farmers, _inter_

---

[1] This includes farmers who have been discriminated against on the basis of age, sex, marital status, race, color, national origin or religion.

alia, of equal and fair access to farm programs, and due process, resulting in substantial damages to them.

In May 1997, defendant's officials admitted that, in early 1983, the Reagan administration had quietly disbanded and dismantled the civil rights enforcement arm at the United States Department of Agriculture ("USDA") and that discrimination complaints had not been properly investigated since 1983. Two federal reports, issued in February, 1997, verified these facts. Further, defendant's own Office of Inspector General has stated that, since then, the defendant's civil rights oversight agency, the Office of Civil Rights, has failed to adequately deal with the problems USDA has in effectively processing civil rights claims.

Plaintiffs, allege that this discriminatory treatment was imposed on women, minorities and other protected farmers in a manner as egregious as that visited upon African-Americans, Native Americans, and Hispanic Americans. See Pigford, et al. v. Glickman, Civil Action No. 97-1978 (PLF), and 185 F.R.D. 82 (D.D.C. 1999)(approving Consent Decree); Keepseagle, et al. v. Glickman, Civil Action No. 1:99cv03119 (D.D.C. 1999); Garcia, et al. v. Glickman, Civil Action No. 1:00cv02445 (D.D.C. 2000).

## JURISDICTION

1.   Jurisdiction is founded upon 15 U.S.C. § 1691, 15 U.S.C §
1691e(a), 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 2201, 42
U.S.C. § 2000d, 5 U.S.C. § 706 and 7 U.S.C. § 2279.

## VENUE

2.   Venue lies in this judicial district because the claim
arose in this judicial district, and pursuant to 28 U.S.C. §
1391(e).

## PARTIES

(There are five class representatives—four women (Ms. Love,
Ms. Bara-Weaver, Ms. Odom, and Mrs. Lennon) and one elderly man
(Mr. Murnion))

3.   Plaintiff and proposed Class representative RoseMary
Love is a woman rancher who has operated ranches in Blaine and
Glacier Counties, Montana, with her estranged husband, Clinton
Love. They started raising sheep in 1975, and operated their
1,056 acre ranch in Blaine County.  In 1980, they leased 20,000
acres in Glacier County, Montana.  In 1983, they acquired their
2,600 acre ranch in Glacier County and leased another 1,500
acres. At the height of their operation, in 1983, they were
running approximately 3,300 sheep.  Ms. Love (a) timely applied
for various loan programs with defendant during the period 1982
to 1989 and was subject to willful and continuous discrimination
on the basis of her gender, causing Ms. Love substantial damages,

and (b) timely filed complaints with defendant of these acts of discrimination, which complaints were never acted upon pursuant to applicable law.  In each instance of discrimination, male farmers received more favorable treatment from USDA.

4.   In 1978, following a devastating drought in the area, they began dealing with FSA. They received an emergency loan that year. They increased their borrowings from FSA over the next three years as they encountered further natural disasters and low commodity prices, and (like so many other farmers with substantial debt loads) record high interest rates. Through receipt of additional emergency and economic emergency loans, by 1982 they owed FmHA approximately $897,000.

5.   RoseMary was the one who dealt with FmHA in most instances on behalf of the Loves.  She was the one who worked on farm and home plans with the FmHA County Supervisor and other county office staff.  Thus, although both her and estranged husband's names were on the paperwork, she for all practical purposes played the central role with FmHA in loan applications and loan servicing for the Love sheep operation.

6.   RoseMary Love completed the ranch's Farm and Home Plan for 1982 operating loan purposes in the fall of 1981. By June 1, 1982, the Blaine County FmHA office had still not finished processing it, having revised it four times in the interim. Then,

the 1982 operating loan was both late (funds weren't received until the end of July) and for about $100,000 less than needed to operate the ranch. It also included 10 conditions dictated by FmHA without the consent of RoseMary Love or her estranged husband, including a demand that they liquidate the ranch operation as soon as practicable.

7.    In May of 1983, FmHA accelerated on all the loans, demanding payment in full in 30 days. This forced the Loves into Chapter 11 bankruptcy. At about this time, a Federal court in South Dakota, in <u>Coleman v. Block</u>,  had issued a stay of adverse actions by FmHA against its farm borrowers. However, FmHA, through its lawyers, ignored both the stay of adverse action issued in the bankruptcy and the <u>Coleman</u> stay, and arranged for the transfer – in June of 1984 – of most of the Love's sheep to a third party. These were the Love's primary income-producing assets on the ranch. In addition, the transfer caused the Loves to lose their Glacier County operation.  Thus, FmHA's action most certainly doomed the Loves' farming operation to ultimate failure.

8.    Further, it should be noted that, before the loan was accelerated, for the sheep that RoseMary Love was able to hang on to, FmHA refused to allow Love to sell the wool from the sheep even though they could not properly feed them. Also, FmHA refused

to allow the  Loves to sell other ranch security (land, crops, or machinery) to obtain feed for these sheep. As a result, many of them died of starvation.

9.   RoseMary Love and her estranged husband hung onto the ranch, even though its income flow was slashed to practically zero, for several more years. Then, on December 16, 1988, RoseMary Love applied for 1951-S servicing. On March 2, 1989, she and her ex-husband were notified that they were determined eligible by the State FmHA office. However, the lawyers for FmHA prevented the implementation of this option by making a baseless claim that the Loves had not shown good faith in their dealings with FmHA.

10.  While all these adverse actions were being conducted against RoseMary Love, a number of similarly situated male farmers were receiving substantial loan servicing benefits to allow them to deal with the stresses caused by physical disasters, low commodity prices, and record high interest rates. A prime example is Neil Johnson (and his family) doing business as the Johnson Cattle Company of Glacier County, that received loans in the same time frame as the Loves. In 1981, it was made eligible for low interest limited resource loans, provided an emergency loan in 1985, and were given debt forgiveness, i,e., had debt simply written off, for $1 million in 1989.

11.   Most painful to RoseMary Love was the crude
insensitivity shown by the Blaine County FmHA staff when, in
early February 1983, she had a radical mastectomy because she had
cancer. Less than 48 hours after the operation, as she lay on her
hospital bed under sedation, the county loan supervisor came to
her to get her to sign a new security agreement. The local FmHA
office was so eager to complete the paperwork needed to
strengthen its position against the Loves (who supposedly were
its customers) that it completely overstepped the bounds of
common decency.

12.   RoseMary Love filed a complaint with Secretary Mike
Espy regarding her disparate treatment in May of 1993, and she
filed a discrimination complaint with USDA's Office of Civil
Rights (OCR) on April 10, 1997. The case was investigated in 1998
and the USDA investigator indicated to her that he had found
evidence of unfair treatment. On the basis of this finding, Love,
through her attorney, diligently sought to negotiate a resolution
of the complaint administratively by OCR. However, some two years
after the investigation was completed, in June of 2000, the
Director of OCR by letter informed RoseMary Love that she had
insufficient basis for settling the complaint informally, leaving
RoseMary Love with only the option of entering into a long and

expensive administrative law judge proceeding if she chose to resolve her case short of filing a law suit in Federal court.

13. Plaintiff and proposed Class Representative, Lind Marie Bara-Weaver, is a female farmer and resident of Palm Coast, Florida. Plaintiff farmed for 15 years in Virginia where she raised Welch ponies, Holly trees, and worms. Ms. Bara-Weaver (a) timely applied for various loan programs with defendant during the period 1984 to 1998 and was subject to willful and continuous discrimination on the basis of her gender, causing Ms. Bara-Weaver substantial damages, and (b) timely filed complaints with defendant of these acts of discrimination, which complaints were never acted upon pursuant to applicable law. In each instance of discrimination, male farmers received more favorable treatment from USDA.

14. In October 1984, Ms. Bara-Weaver attempted to apply for farm ownership and operating loans at the Loudon County FmHA office in Leesburg, Virginia, to purchase and operate a 16.5 acre farm. At the office, the loan officer, Mr. Faulk, informed Ms. Bara-Weaver that neither funds nor forms were available. She was not given an application.

15. In late October or early November of the same year, Ms. Bara-Weaver visited the Leesburg FmHA office again, and was told a second time that neither funds nor forms were available. Ms.

Bara-Weaver's husband called USDA and forms were mailed to him. Ms. Bara-Weaver filled out the forms as the sole borrower and delivered them to Mr. Faulk at the Lessburg FmHA office.  Two days later her application was denied.

16.  In the Summer of 1988, Ms. Bara-Weaver again attempted to apply for farm ownership and operating loans through the Loudon County FmHA office. She was told no applications were available.

17.  Ms. Bara-Weaver made formal complaints to the FmHA state office in Richmond and to the USDA Office of the Inspector General in Washington, DC. The Richmond office sent her the loan application, without any of the additional forms required to complete the application.

18.  Ms. Bara-Weaver submitted her application (without the additional forms) to Mr. Reed, the loan officer in Loudon County. Mr. Reed told Ms. Bara-Weaver that farming was not a good business for women. He then stated the additional forms she needed were available to her in exchange for sexual favors. Ms. Bara-Weaver left the office immediately.

19.  Ms. Bara-Weaver contacted the office of Senator John Warner and received the additional forms she needed to complete her application.

20.   As part of the loan application process, the property Ms. Bara-Weaver wished to purchase had to be appraised by Mr. Reed. During the appraisal visit, Mr. Reed made sexual advances toward her.  Ms. Bara-Weaver again rejected his advances. Her loan was denied.

21.   In May 1993, Ms. Bara-Weaver's equine breeding stock was poisoned by contaminated feed. Plaintiff visited the FmHA office, which by then had been moved to Fredericksburg, to inquire about a loan to help with veterinarian expenses and special feed. Plaintiff was told that FmHA did not provide such loans or assistance.

22.   In the Fall of 1994, Ms. Bara-Weaver submitted completed applications for a farm ownership and operating loan by certified mail to the Fredericksburg FmHA office. Although FmHA had signed for Ms. Bara-Weavers's application package, when she called to check on the status of her applications, FmHA told her they did not have her applications.

23.   In January 1998, after her husband's death, Ms. Bara-Weaver attempted to refinance the farm through a trust for her daughter, and sought FSA financing at the Fredericksburg office. She was told that USDA did not deal with trusts, despite the fact that USDA program regulations specifically refer to trusts.

24.   Plaintiff and proposed Class representative Margaret Odom is a female farmer and resident of Sardis, Georgia. She raised cattle and row crops.   Ms. Odom (a) timely applied for various loan programs with defendant during the period 1984 to 1998 and was subject to willful and continuous discrimination on the basis of her gender, causing Ms. Odom substantial damages, and (b) timely filed complaints with defendant of these acts of discrimination, which complaints were never acted upon pursuant to applicable law.   In each instance of discrimination, male farmers received more favorable treatment from USDA.

25.  In December 1991, Ms. Odom applied for an operating loan at the Waynesboro, Georgia FmHA office in Burke County and was denied.  She was told by FmHA loan officer Alphonzo Andrews, that she did not qualify as a beginning farmer, and that she would not be able to get a loan from their office until she had been farming for a year, even though she had farmed with her husband for years.

26.   Ms. Odom farmed in 1992 with her own funds.  In 1993, she applied again for an operating loan at the same FmHA office. Her loan was denied because FmHA alleged she farmed in an "unworkmanlike manner".  She hand-delivered a complaint to the USDA State Director, Gene Carr, at the State Office in Athens, Georgia.  Mr. Carr and three loan servicing specialists met with Ms. Odom that same day.  The next day, Mr. Andrews called her and informed her that she had been approved for the loan.

27.   In 1993, the Sardis region was declared a disaster area. Ms. Odom applied to the Waynesboro ASCS office for disaster benefits and was denied. She appealed the decision to USDA's National Appeals Division ("NAD").  NAD ruled in her favor.  She received disaster benefits for that year and a debt reduction.

28.   In 1994, Ms. Odom applied for a farm ownership loan and an operating loan at the Waynesboro FmHA office.  She was denied for both. FSA's stated reason for denying Ms. Odom's applications in 1994 was virtually identical to the reason the Agency denied her 1993 disaster benefits -- which reason had been overturned by NAD.  Ms. Odom appealed the 1994 loan denials to NAD.  Again NAD ruled in her favor.

29.   Based on the NAD decision, in 1995, Ms. Odom went back to FSA to reapply for the same loans for which she had been wrongfully denied in 1994. She was told she had to fill out new

applications, which she did.  Ms. Odom was denied again for
farming in an "unworkmanlike manner" which NAD had in 1994 ruled
as an invalid basis for denying Ms. Odom access to federal farm
programs.  She appealed the 1995 decision and again, NAD ruled in
her favor.  In 1997 and again in 1998, Ms. Odom reapplied for the
same loans and was denied for the same reason NAD ruled invalid
in 1994 and 1995.

30.  Because FmHA discriminatorily denied Ms. Odom's loans
for years, despite NAD rulings in her favor, Ms. Odom's finances
were severely strained. However, in 1998, FSA refused to
restructure her debt.

31.  Plaintiff and proposed Class representative, Gail
Lennon, is a female farmer and resident of Lookout, California.
Ms. Lennon (a) timely applied for various loan programs with
defendant during the period 1983 to 1996 and was subject to
willful and continuous discrimination on the basis of her gender,
including defendant's imposition of restrictive conditions on her
loans, defendant's failure to process her requests for loan
servicing and grant her a timely and adequate appeal, causing her
substantial damages, and (b) timely filed complaints with
defendant of these acts of discrimination, which complaints were
never acted upon pursuant to applicable law.  In each instance of

discrimination, male farmers received more favorable treatment from USDA.

32.  In July, 1983, Ms. Lennon applied for a farm ownership and operating loan at the Modoc County FmHA office in Alturas, California[2].  She needed the loans to purchase a ranch where she intended to raise cattle and pigs.  FmHA demanded excessive collateral for the loans.  Collateral valued at approximately $748,000 – the purchased ranch (545 acres, appraised at $435,000), an additional 130 acres valued at approximately $200,000, equipment valued at approximately $100,000, and 25 mother cows valued at approximately $13,000 – was taken as collateral for loans totaling $273,000.  When Ms. Lennon questioned the severe collateral requirements, County Supervisor Lloyd Leighton responded that he was acting in accordance with regulations.  Ms. Lennon's loan funds were placed in a supervised account, which meant funds could not be released for any purpose without the consent of FmHA.

33.  Pending the processing of these USDA loans, County Supervisor Lloyd Leighton promised Ms. Lennon that (a) if she obtained a short-term loan from the local production credit association (hereinafter, "PCA") that said loan would be paid in

---

[2] FmHA required Mr. Lennon, a school teacher, to be named as an applicant for the loan even though Ms. Lennon signed all farm-related documents and conducted all farm-related business.

full by the USDA loans, and (b) due to the time required to
develop a profitable ranching operation, Ms. Lennon would not
have to make payments on the USDA loans until 1985.  USDA did not
keep these promises.  In fact, in 1985, the new Modoc County
Supervisor denied Ms. Lennon access to operating funds from her
supervised account and told her that she was delinquent on her
payments for the 1984 loans – payments that the former County
Supervisor had indicated would not become due until 1985.

34.  On numerous occasions beginning in December 1984, Ms.
Lennon requested USDA loan servicing.  USDA denied said servicing
on each occasion – including, after 1986, when USDA's National
Appeals Division ruled in favor of Ms. Lennon and ordered the
Modoc County Office to provide her with maximum servicing.
Between 1988 and 1996, Ms. Lennon was repeatedly denied due
process in her attempts to appeal USDA's refusals to provide loan
servicing.

35.  In April 1997, Ms. Lennon filed a civil rights
complaint against USDA alleging gender discrimination.  As of
October 19, 2000, USDA has not responded to her complaint.

36.  Plaintiff and proposed Class representative, James
Murnion, is a 73-year old farmer in Wheatland County, Montana.
His farm consists of 4,500 acres, including 500 acres of
irrigated cropland, 2,500 acres allocated to dry land wheat, and

the rest used for grazing 600 sheep and 40 cattle. Mr. Murnion (a) timely applied for various loan programs with defendant during the period beginning 1997 to 1998 and was subject to willful and continuous discrimination on the basis of his age, causing Mr. Murnion substantial damages, and (b) timely filed complaints with the defendant of these acts of discrimination, which complaints were never acted upon pursuant to applicable law.  In each instance of discrimination, younger farmers received more favorable treatment from USDA.  Beginning in 1974, Mr. Murnion had taken out several emergency loans from the Farm Service Agency ("FSA") in years when his area of Montana suffered disaster losses due to bad weather or other conditions beyond the control of the farmer. His debt to FSA on these loans had built to $320,000 by 1997 and he was having trouble servicing the debt. The debt was secured by a mortgage on the ranch real estate.

37. With the assistance of a farm financial consultant, Keith McGruder, Mr. Murnion had developed a plan to pay off the debt in full (without any write-off) and at all times to keep the debt more than fully collateralized. Under the proposed plan, Mr. Murnion's son would assist him in operating the ranch. Mr. Murnion met with  the Wheatland County FSA agricultural credit manager, Mr. Stuver, in early 1997 to discuss the proposed plan to pay off the debt. Also present at the meeting were Mr.

Murnion's wife and son, and Mr. McGruder. During the negotiations, the  parties got very close to an agreement on a pay-back schedule (they were only $1,000 apart on the amount of the annual payment Murnion would have to make under the plan). At that point, however, Stuver refused to consider the plan any further because of Mr. Murnion's age. He said, "you have to sign the ranch over to someone else because you are 70 years old". Even though Mr. Murnion and his advisor reviewed in detail the economic viability of the proposed plan, Stuver would not consider it, repeating over and over that, because of his age, Mr. Murnion would have to sign the ranch over and out of his name. After this meeting, Mr. Murnion tried to get Stuver to reconsider; but Stuver never returned his phone calls and refused to meet with him further.

38. FSA having rejected his pay-back plan, Murnion was unable to make timely payments under the existing debt structure; so FSA initiated foreclosure on against him. The ranch was sold at a sheriff's auction, and FSA bought it for the amount of the debt Mr. Murnion owed him. FSA failed to file a certificate of sale, so as a legal matter, the agency never officially owned the property. Nonetheless, a year later, Mr. Murnion, rather than fight FSA in court on its ownership of the land, exercised his right of redemption and paid off FSA in full. He did this by finding a third party buyer for all but 1,000 acres of the ranch. As a result of the foreclosure process, Mr. Murnion suffered substantial and unnecessary losses. He lost all of his irrigated and dry land wheat acreage, and was forced to sell his equipment and supplies for a loss of over $90,000. His economic losses totaled over $400,000. Even worse, the stress induced by the foreclosure process caused him to have a heart attack in July 1998.

39. Mr. Murnion filed a complaint regarding the age discrimination against him with USDA's Office of Civil Rights ("OCR") in March 1997. After sending an investigator out to interview Mr. Murnion in May 1998 and receiving supplementary information from him in December of 1998, OCR has done nothing to process his complaint other than to occasionally send him

paperwork stating that the case is still pending.  Early in the process, Mr. Murnion made repeated calls to OCR to find out the status of his case, but never got a satisfactory answer. He eventually gave up trying. Defendant's failure to act on his discrimination complaint has caused Mr. Murnion further damage.

40.  Defendant, Dan Glickman, is Secretary of the United States Department of Agriculture ("USDA"), and is the federal official responsible for the administration of the statutes, regulations and programs which are the focus of this action.

HOW DEFENDANT IS ORGANIZED AND,
GENERALLY, THE GOVERNMENT PROGRAMS AT ISSUE

41.  USDA's Farm Service Agency ("FSA") provides commodity program benefits (such as deficiency payments, price support loans, conservation reserve program ("CRP") benefits), disaster payments, farm loans and other farm credit benefits to U.S. farmers.  The agency was created in 1994, as a result of a reorganization of USDA, primarily by the merger of the Agricultural Stabilization and Conservation Service ("ASCS", which previously had handled commodity program benefits, price support loans, CRP payments, disaster payments, and related services) with the Farmers' Home Administration ("FmHA", which previously had provided farm loans and other farm credit benefits).

42.   FmHA was created decades ago to provide loans, credit and technical assistance for farmers.   FmHA made loans directly to farmers or guaranteed the loans made to farmers by private, commercial lenders.   These loans included "farm ownership", "operating", and "continuing assistance" loans, as well as loans that "restructure" existing loans and "emergency disaster" loans. FmHA's key responsibilities were to work with small, minority and disadvantaged farmers – farmers who could not get credit elsewhere, and to assist these farmers in developing their financial plans and loan applications.

43. ASCS was an agency of USDA created to provide services to U.S. farmers under the price support, deficiency payment, CRP, and related programs to stabilize farm income and prices, and to assist in the conservation of land.

44.   Defendant Glickman is responsible for the administration of the Farm Service Agency (FSA) and previously FmHA & ASCS. FSA, like FmHA and ASCS before it, administers the federal farm programs through a three-tiered review system consisting of (1) county offices and committees, (2) state offices and committees, and (3) a federal level of review in Washington, D.C., the National Appeals Division ("NAD"). The local county committees consist of producers from a county who have been elected by other producers in that county; they oversee the county offices. The state committees consist of producers from each state selected by the Secretary of USDA; they oversee the state offices. At the federal level NAD renders final determinations of administrative appeals. (Prior to the 1994 consolidation, FmHA had its own administrative appeal process).

45.   The Minority and Socially Disadvantaged Program Offices within USDA have the primary responsibility for coordinating USDA programs serving minorities and the socially disadvantaged. USDA defines women as minorities and as socially disadvantaged.

## HOW FARMERS (1) APPLY FOR LOANS AND CREDIT WITH USDA AND (2) APPLY FOR PARTICIPATION IN OTHER FARM PROGRAMS WITH USDA

46.   When a farmer applies for any federal farm loan or program, she goes to her county office (formerly the FmHA office), and fills out a Farm and Home Plan ("FHP", a financial plan for the farm), along with her loan application, which requires the

assistance and guidance of defendant's officials to complete. Assistance and guidance is critical because of the complexity of the programs and forms. This application process has been done pursuant to regulations found at 7 C.F.R. § 1910, et seq. If the farmer needs an ASCS-type benefit or assistance, she works with her County Executive Director ("CED") (who is an employee of the county committee paid by USDA) and county committee in applying for participation or benefits. The process has been done pursuant to ASCS regulations (7 C.F.R. Part 700, et seq.) and Commodity Credit Corporation ("CCC") regulations (7 C.F.R. Part 1400, et seq.).

47. When the federal farm loan application with its supporting documents is completed, it is presented to the county committee. If the farmer is approved for participation, the loan is processed. The Equal Credit Opportunity Act ("ECOA") prohibits discrimination in credit based on sex, marital status, race, color, age, national origin, or religion. 15 U.S.C. §1691(a). If an FSA loan, or loan services, is denied on discriminatory grounds, the farmer can file a complaint of discrimination with the defendant and the FSA Civil Rights Office (for FmHA, formerly the Equal Opportunity ("EO") office) or with the Office of Civil Rights ("OCR") formerly known as the Office of Civil Rights Enforcement and Adjudication("OCREA").

48.   With respect to ASCS-type programs, the application is reviewed by the CED and then presented to the county committee. If approved, the ASCS benefits are awarded.   Title VI of the Civil Rights Act of 1964 prohibits exclusion from participation in federal programs based on race, color, or national origin.   With respect to ASCS-type applications, if a farm program application is denied on discriminatory grounds, the farmer can file a complaint of discrimination with the defendant or OCR.

HOW PLAINTIFFS AND MEMBERS OF THE CLASS WERE DAMAGED --
WHAT DEFENDANT DID IN RESPONSE TO COMPLAINTS OF DISCRIMINATION

49. Unbeknownst to plaintiffs and members of the Class, defendant disbanded the enforcement ability of EO and OCREA in 1983, leaving defendant with no ability to investigate discrimination complaints.   In a May 25, 1997, Richmond News Dispatch article and interview of Lloyd Wright, Director of USDA Office of Civil Rights, Mr. Wright stated that (1) no systematic probes or investigations had been taken since 1983, when the Reagan administration disbanded the Civil Rights investigative staff, and (2) that agency regulations and the provisions of the Civil Rights Act of 1964, et al. had been violated.   In a January 5, 1999, New York Times article, Rosalind Gray, who succeeded Wright as head of the Office of Civil Rights, stated that USDA "would agree that its procedures in handling bias claims had been

flawed." Further evidence of defendant's willful failure to investigate discrimination complaints is evident in the February 27, 1997, Office of Inspector General Report ("OIG Report"), (attached hereto as Exhibit A) and the February, 1997 Civil Rights Action Team Report ("CRAT Report"), (attached hereto as Exhibit B), both explained below.

50. On March 10, 2000, the Office of Inspector General released its Seventh audit report "Office of Civil Rights Status of the implementation of Recommendations Made in Prior Evaluations of Program Complaints – Phase VII ("OIG Report VII" attached hereto as Exhibit C). The report states OCR's processing of Civil rights complaints remains flawed: " This is our seventh attempt to provide CR with constructive ways to overcome its inefficiencies. Based on the results of our review and on the operating environment we observed at CR, we cannot report encouraging news." (OIG Report VII, Viadero cover letter at 1) "…[N]o significant changes in how complaints are processed have been made." (OIG Report VII at i).

51. The Department of Justice ("DOJ") is required to ensure that Federal agencies meet their Title VI enforcement obligations and provide civil rights protection to persons filing discrimination complaints in the FSA programs. DOJ has failed to ensure that defendant meets its Title VI obligations.

52.   Within USDA, in past years, the Policy Analysis and Coordination Center ("PACC"), an agency under the Assistant Secretary for Administration, was responsible for civil rights compliance and developing regulations for processing program discrimination complaints at USDA.   <u>See</u> OIG Report at 4.   OCREA was responsible for processing program discrimination complaints received by USDA from participants in FSA programs.   <u>See</u> OIG Report at 4.

53.   OCREA was required to forward written complaints of discrimination from USDA program participants to the appropriate agency within USDA asking the agency to attempt conciliation of the complaint.   If conciliation was not successful, the agency was to be instructed to perform a preliminary inquiry and make a recommendation of a finding of "discrimination" or "no discrimination".   OCREA was to perform its own analysis of the complaint and the preliminary inquiry and make a recommendation to the Assistant Secretary for Administration on the finding of "discrimination" or "no discrimination".   <u>This process never occurred during the relevant period covered by this lawsuit</u>.   <u>See</u> OIG Report at 4.

54.   FSA's Civil Rights and Small Business Utilization Staff (CR&SBUS) has been responsible for handling program discrimination complaints within FSA.   <u>CR&SBUS never followed proper procedure</u>

<u>pursuant to the law during the relevant period covered by this</u> <u>lawsuit</u>. <u>See</u> OIG Report at 5.

55. The applicable State Civil Rights Coordinator in FSA was responsible for obtaining a conciliation agreement or performing a preliminary inquiry and forwarding it to CR&SBUS. If a conciliation agreement was reached with the complainant, CR&SBUS was to forward the agreement to OCREA and recommend the discrimination complaint be closed. If a preliminary inquiry was performed, CR&SBUS would analyze the information and determine if discrimination was found; CR&SBUS was to forward the preliminary inquiry and its analysis to OCREA with its determination. <u>These</u> <u>procedures were never properly followed</u>.

56. USDA has codified regulations, 7 C.F.R. Part 15 - "Nondiscrimination", which state USDA's policy of nondiscrimination in federally assisted and conducted programs in compliance with Title VI of the Civil Rights Act of 1964. <u>The</u> <u>regulations should have served as a basis for civil rights</u> <u>compliance and enforcement with respect to participants in FSA</u> <u>programs; however, defendant admits the regulations have long been</u> <u>and still are outdated and never reflected the departmental</u> <u>agencies, programs and laws</u>. <u>See</u> OIG Report at 5.

57. USDA Regulation 4330-1, which is over 13 years old, dated June 27, 1986, set the departmental policy for program civil

rights compliance reviews, <u>but did not provide policy and guidance for processing program discrimination complaints</u>.  <u>See</u> OIG Report at 5.

58.  On December 12, 1994, in a management alert to the then Office of Civil Rights Enforcement, defendant's Office of Inspector General (OIG) reported problems with how USDA received, processed, and resolved program discrimination complaints.  OIG recommended that "a departmental regulation be promulgated that sets forth the authorities of the Office of Civil Rights Enforcement and that written procedures and controls be established governing the receipt, processing, and resolution of program discrimination complaints within established timeframes".  OIG Report at 5.

23   59.  <u>The regulation was never published</u>.[3]

60.  After years of abuse and neglect of Black, Native American, Hispanic, Women, Minorities and other protected farmers, OIG finally undertook an investigation and review, the results of which were released on February 27, 1997, of defendant's program discrimination complaints within FSA as well as 10 other agencies within USDA.  OIG found, <u>inter</u> <u>alia</u>, that the discrimination

---

[3]The U.S. Commission on Civil Rights issued a report in June 1996, titled <u>Federal Title VI Enforcement to Ensure Nondiscrimination in Federally Assisted Programs</u>.  This report also had specific findings and recommendations critical of the USDA system for processing discrimination complaints.

complaint process within FSA lacked "integrity," and
"accountability" was without a tracking system, was in "disorder,"
did not resolve discrimination complaints, and had a massive
backlog:

> The program discrimination complaint process at FSA
> lacks integrity, direction and accountability. The
> staff responsible for processing discrimination
> complaints receives little guidance from management,
> functions in the absence of any current position
> descriptions or internal procedures, and is beset with
> its own personnel EEO problems. The staff also
> processes discrimination complaints without a reliable
> tracking system to determine the status of the
> complaints and, apparently, without deadlines to resolve
> the complaints. The resulting climate of disorder has
> brought the complaint system within FSA to a near
> standstill. Little gets accomplished to resolve
> discrimination complaints or to make program managers
> aware of alleged problems within their programs. After
> developing our own database of unresolved cases, we
> determined that as of January 27, 1997, FSA had an
> outstanding backlog of 241 complaints. OIG Report at 6
> (emphasis added).

61. OIG found that the FSA staff responsible for processing
the discrimination complaints consisted of two untrained and
unqualified people:

> The FSA staff responsible for processing
> discrimination complaints, the Civil Rights and Small
> Business Utilization Staff (CR&SBUS)" has two full-time
> program specialists working to resolve program
> complaints. These program specialists are supplemented
> by an administrative assistant who provides secretarial
> support and two staff assistants who maintain case files
> and the tracking system. The two program specialists
> and the two staff assistants transferred to FSA from the
> civil rights staff of the former Farmer's Home
> Administration (FmHA) during the Department's

reorganization in October 1995.  <u>The staff assistants</u>
<u>have been performing analyses of the preliminary</u>
<u>inquiries conducted on the complaints,</u> <u>although they are</u>
<u>not trained or otherwise qualified to do so</u>.  None of
the former FmHA employees with CR&SBUS have position
descriptions to reflect their current duties and
responsibilities, and none have received performance
appraisals for fiscal year 1996. OIG Report at 6
(emphasis added).

62.   OIG found a "massive backlog" of unprocessed FSA

complaints.  OIG Report at 6.

63. OIG found the FSA files "disorganized" and unaccountable:

     CR&SBUS was unable to provide us with an accurate
number of outstanding complaints or their status.  We
reviewed the case files and found them <u>generally</u>
<u>disorganized</u>.  It was difficult for us to readily
<u>determine the date of the complaint, the reason it was</u>
<u>brought, and the status of its resolution</u>.  OIG Report
at 7 (emphasis added).

64.   OIG found hundreds of FSA cases unresolved:

     Our review at the CR&SBUS and CREA disclosed that,
between them, they had listed a total of 272 cases as
being active.  <u>The oldest case listed dates back to 1986</u>
... After resolving all duplications and determining the
actual status of the 272 cases, we found that FSA had
241 cases of program discrimination complaints that had
<u>not been resolved</u>.  OIG Report at 7 (emphasis added).

65.   OIG found repeated unaccountability and missing files:

     During our reconciliation of the two agencies'
lists, we noted that some cases were listed by one or
the other agency but could not be found in its filing
system.  CR&SBUS listed 32 cases that we could not find
in its filing system, and CREA listed 28 cases that we
could not find in its filing system.  We also noted that
CR&SBUS listed cases unknown to CREA. CR&SBUS listed 19
cases that CREA did not list.  OIG Report at 7.

66.    OIG   found   there   was   no   reliable   method   to   the

processing:

CREA had officially closed 30 of the 272 cases with
findings of no discrimination.  CREA had also closed one
case with a finding of discrimination, and the
complainant was compensated.  The case involved the FSA
disaster program, and the complainant received the
benefits which were at first denied by FSA.  Four of the
remaining 24 cases had findings of discrimination as
determined by CREA and are pending resolution.  One of
the four complainants has not responded to the
Department's written notice regarding filing a claim for
compensation.   Office of Operations officials are
negotiating a settlement with the remaining three
complainants.  OIG Report at 7-8.

67.  OIG found improperly closed files and improper reviews,

and many files with no documentation:

We found that FSA improperly closed and forwarded
30 complaints to program managers, without notifying the
Department (26 of 30 cases were closed under the old
FmHA agency management).   The civil rights staff
concluded without first receiving concurrence from the
Department that these cases were the result of
"programmatic discrepancies" (i.e., agency error rather
than civil rights violations).  Without departmental
concurrence with its findings, the agency may not have
addressed the legitimate cases of discrimination.  CREA
has the responsibility to make final determination of
program discrimination.  FSA may recommend to CREA that
cases be closed, but it does not have the authority to
close these cases without concurrence from CREA.  For
example, we noted that in one instance FSA (the former
FmHA) incorrectly concluded that a case had only
programmatic concerns and closed the case without
forwarding it to the Department.  Only after a civil
rights staff member complained, did FSA process the case
as a civil rights discrimination case.  The civil rights
staff stated in a letter that the allegation of racial
discrimination was overlooked.  The mix-up was discussed
with the Department, which determined that the case
should be processed by the civil rights staff. For most

of the <u>remaining cases, we found no documentation in the case files at FSA that the Department has reviewed these cases</u>.  OIG Report at 8 (emphasis added).

68.  OIG found 58% of the FSA civil rights complaint case files were over 1 year old and over 150 cases were almost two years old:

> [T]he average age of the 241 cases we consider open because they were not officially closed by the Department.

| No. of Cases | Program | Average Age |
|---|---|---|
| 151 | Ag. Credit (Farm Loans) | 703 Days |
| 40 | Disaster | 485 Days |
| 50 | Others | 482 Days |

> Of the 241 open cases, 139 (58 percent) were known to be over 1 year old.  Of the 241 cases, 129 (54 percent) are awaiting action in FSA; the remaining 112 cases (46 percent) are in the hands of the CREA staff in USDA's Office of Operations. Sixty-five of the cases at FSA (50 percent) need a preliminary inquiry.  Some of these date back to 1993.  OIG Report at 8.

69. OIG found no system within FSA for reconciliation or tracking of civil rights complaint cases:

> CR&SBUS has no procedures in place to reconcile or track the status of complaints after they are forwarded to CREA.  <u>Therefore, CR&SBUS could not tell us the status of complaints at CREA</u>.  As noted above, both CR&SBUS and CREA had different numbers and were not aware of all the outstanding complaints.  OIG Report at 8 (emphasis added).

70.  OIG found no management oversight within FSA with respect to the handling of civil rights complaints:

"CR&SBUS also does not prepare management reports to inform FSA program managers of alleged problems of discrimination within their programs.  Without this information, program managers may not be aware of potential discrimination in the programs they are responsible for administering."  OIG Report at 9.

71.  With respect to defendant's Office of Operations, Civil Rights Enforcement and Adjudication, OIG found repeated inaccuracies and unaccountability:

[T]he listing of outstanding cases provided by CREA contained inaccurate information.  In some instances we were unable to locate the case files at CREA that were on its outstanding case list.  Without reviewing the case files, we were unable to verify the status of the complaints.  Also, CREA and FSA had not reconciled their cases, and neither could inform us of the correct number of outstanding cases.

CREA does not have controls in place to monitor and track discrimination complaints.  When complaints are received they are logged in, given a case number, and after the agency forwards the preliminary inquiry to CREA, the case is assigned to one of its seven program specialists. There are no procedures to require the program specialists to follow up on overdue responses from the agency.  We have found that CREA is not following up on discrimination cases it returned to FSA for conciliation or performance of a preliminary inquiry.  CREA advises the agency that it has 90 days to complete its review, but it does not follow up with the agency to determine the status of the complaint. OIG Report at 9.

72. OIG surveyed 10 other USDA program agencies in addition to FSA, to determine the procedures used for processing program discrimination complaints and <u>found the same problems</u>.  <u>See</u> OIG Report at 10-11.

73. OIG compiled a list of outstanding ("open") program discrimination complaints, as late as 1996, within the Department, totaling 271.  <u>See</u> OIG Report at Attachment A.

74. At the same time that OIG released its report, a USDA Civil Rights Action Team ("CRAT") released its report, dated February 1997, condemning defendant's lack of civil rights enforcement and accountability, which was a cause of the drastic decline in the number of minority farmers:

> According to the most recent Census of Agriculture, the number of all minority farms has fallen -- from 950,000 in 1920 to around 60,000 in 1992. CRAT Report at 14.

75. USDA's Economic Research Service has stated:

> Farms of female operators were smaller on average – 309 acres – than the U.S. average, although not as small as those of Blacks or Asians and Pacific Islanders. The average value of sales, however - $35,000 – fell below all other operator groups except Blacks. Two-thirds of female-operated farms had sales below $10,000, compared with half of all U.S. farms, and only 20 percent had sales of $25,000 or more. Anne B.W. Effland et al., "Minority & Women Farmers in the U.S.", Agricultural Outlook, AO-251, May 1998, p. 19 (attached hereto as Exhibit D)

> Although females are a majority in the U.S. population, women are a minority among farm operators. Only 145,200 farm operators were women in 1992, or 7.5 percent of the U.S. total, but their numbers are increasing. Economic Research Service, USDA, farm Structure Briefing Room, found at www.USDA.gov, (attached hereto as Exhibit E)

76.  CRAT found that minority, limited-resource, and women farmers look to USDA's discrimination in managing benefit programs as responsible for their involuntary loss of land:

> These farmers blame USDA's program delivery system, with its wide-ranging and relatively autonomous local delivery structure.  They charge that USDA has long tolerated discrimination in the distribution of program benefits and misuse of power to influence land ownership and farm profitability.  They blame farm program regulations that – intentionally or not – shut out minority and limited-resource farmers and ranchers from the benefits of the programs that have helped larger non-minority producers survive the changes in agriculture in the last 50 years.  And they blame USDA's insensitivity to the differing needs of minority and limited-resource customers and neglect of its responsibility to reach out and serve all who need USDA's assistance.  CRAT Report at 14.

77. CRAT found a common problem involved minority or small farmers applying to defendant for loans:

> The minority or limited-resource farmer tries to apply for a farm-operating loan through the FSA county office well in advance of planting season.  The FSA county office <u>might claim to have no applications available</u> and ask the farmer to return later.  Upon returning, the farmer might receive an application <u>without any assistance</u> in completing it, then be asked repeatedly to correct mistakes or complete oversight in the loan application.  Often those requests for correcting the application could be stretched for months, since they would come only if the minority farmer contacted the office to check on the loan processing.  <u>By the time processing is completed, even when the loan is approved, planting season has already passed</u> and the farmer either has not been able to plant at all, or has obtained limited credit on the strength of an expected FSA loan to plant a small crop, usually without the fertilizer and other supplies necessary for the best yields.  The farmer's profit is then reduced.  CRAT Report at 15 (emphasis added).

78. CRAT found systematic mistreatment of minority farmers:

> If the farmer's promised FSA loan finally does arrive, it may have been <u>arbitrarily reduced</u>, leaving the farmer without enough money to repay suppliers and any mortgage or equipment debts. <u>In some cases, the FSA loan never arrives</u>, again leaving the farmer without means to repay debts. Further operating and disaster loans may be denied because of the farmer's debt load, making it impossible for the farmer to earn any money from the farm. As an alternative, the local FSA official might offer the farmer an opportunity to lease back the land with an option to buy it back later. The appraised value of the land is set very high, presumably to support the needed operating loans, but also making repurchase of the land beyond the limited-resource farmer's means. <u>The land is lost finally and sold at auction</u>, where it is bought by someone else at half the price being asked of the minority farmer. Often it is alleged that the person was a friend or relative of one of the FSA county officials. CRAT Report at 16 (emphasis added).

79. CRAT found insufficient oversight of farm credit to minorities:

> Currently, the Farm and Foreign Agricultural Services (FFAS) Mission Area, which manages the FSA program delivery system, provides <u>ineffective oversight of the local delivery of farm credit services</u>. CRAT Report at 16 (emphasis added).

80. CRAT found a lack of diversity in FSA program delivery structure:

> Because of the ways in which State and county committees are chosen and county offices are staffed, <u>FSA lacks diversity in its program delivery structure</u>. Federal EEO and Affirmative Employment laws and policies do not govern the FSA non-Federal workforce except by agency regulation. CRAT Report at 18 (emphasis added).

81. CRAT found a lack of minority employees, including a lack of female employees in FSA county offices:

> A recent GAO study indicated that in the 101 counties with the largest concentration of minority farmers, one-quarter had no minority employees in their offices.

> Perhaps the lack of diversity that minority and limited resource customers deem to be most critical, however – and this was confirmed by comments in listening sessions – is the <u>lack of minority and female representatives on the County Committees which affect access to FSA programs</u>.  CRAT Report at 18. (emphasis added).

82. CRAT found lower participation rates and lower approval rates for minorities in FSA programs:

> Recent studies requested by Congress and FSA have found <u>lower participation</u> and <u>lower loan approval rates for minorities in most FSA programs</u>.  Participation rates in 1994 in programs of the former Agricultural Stabilization and Conservation Service (ASCS), particularly commodity programs and disaster programs, were disproportionately low for all minorities.  The GAO found that between October 1, 1994 and March 31, 1996, 33 percent of minority applications but only 27 percent of non-minority applications in the Agricultural Conservation Program (ACP) were disapproved.  During the same period, 16 percent of minority but only 10 percent of non-minority loans in the direct loan program were disapproved.  CRAT Report at 21 (emphasis added).

83. CRAT found discrimination complaints at USDA were often ignored:

> Farmers who told the CRAT stories of discrimination and abuse by USDA agencies also described a complaints processing system which, if anything, often makes matters worse.  They described a bureaucratic nightmare where, even after they receive a finding of discrimination, USDA refuses to pay damages.  They

charged USDA with forcing them into court to seek
justice, rather than working with them to redress
acknowledged grievances. They painfully described the
toll these ongoing battles with USDA has taken on their
families, and on their health. CRAT Report at 22-23.

84.   CRAT found decisions favoring farmers routinely not

enforced by USDA:

However, many farmers, especially small farmers,
who have managed to appeal their cases to FSA charge
that even when decisions are overturned, local offices
often do not honor the decision. They claim that
decisions favoring farmers are simply 'not enforced.'
CRAT Report at 23.


85.   CRAT found minority and women farmers less likely to
appeal decisions:

The D.J. Miller report of 1996 noted that this
system was not beneficial to minority farmers. It found
that "the statistical evidence shows that minority and
female farmers do not file appeals of FSA decisions in
proportion to their share of producers" and "anecdotal
evidence suggests that minorities and females utilize
the appeals process less primarily due to discomfort
with and lack of confidence in the decision makers;
slowness of the appeal process; and lack of knowledge of
appeals rules and regulations; and the time-consuming
bureaucracy of the appeal process." CRAT Report at 23.

86.   CRAT found a lack of USDA regulations for discrimination

complaint processing:

Program discrimination complaints generally fall
within two categories: (1) programs conducted directly
by a USDA agency, such as USDA loan programs, and (2)
federal assisted programs, where USDA does not directly
offer services to customers, but recipients of USDA
funds do. The recipients must obey civil rights laws,
and USDA can be sued under such laws as Title VI, the
Rehabilitation Act, Title IX, the Equal Credit
Opportunity Act, and others. CRAT members were informed

by OGC that USDA presently has no published regulations with clear guidance on the process or time lines involved in program discrimination complaints. When a farmer does allege discrimination, "preliminary investigations" are typically conducted by the agency that has been charged with violating her or his right. CRAT Report at 24.

87. CRAT found discrimination complaints often are not responded to by USDA, including those of women farmers:

USDA doesn't respond even when they do file complaints. In Tulsa, OK. [sic] an advocate representing black and American Indian farmers said, "we have filed 72 civil rights complaints. Not one complaint has even been answered." CRAT Report at 24.

During a CRAT listening session, a female farmer said that the "single largest problem for women is to be taken seriously by the financial Community." CRAT Report at 6.

88. CRAT found record-keeping on discrimination complaints "non-existent" and that a backlog existed:

The CRAT was unable to gather historical data on program discrimination complaints at USDA because record keeping on these matters has been virtually nonexistent. Complaints filed with the agencies are not necessarily reported to USDA's Civil Rights office. Some figures are available however, for cases that were open as of December 31, 1996. The largest number of pending discrimination complaints, as comments at the listening sessions suggests, are concentrated in three agencies at USDA. There were 205 case pending, representing 42 percent of the total, against the FSA: 165, or 33.3 percent against the Rural Housing Service (RHS): and 62, or 12.5 percent against the Food and Consumer Services. Sixty-three cases, or 12.7 percent of the total, were pending against other agencies. The Department had a total of 495 pending program discrimination complaints. Approximately one-half of the pending cases are 2 years old or older, verifying farmers' contention that complaints are being processed slowly, if at all.

According to the Complaints Processing Division at the
Office of Operations (OO), which processes complaints
that make it to the Department level. USDA averages
about 200 new program discrimination complaints each
year. However, in fiscal year 1996, an average of only
9 cases were closed per month, or 108 during the year --
increasing a backlog of program complaints. CRAT Report
at 24-25 (emphasis added).

89. CRAT found that a lack of diversity in FSA county

offices combined with a lack of outreach to small and limited-

resource farmers directly affects the participation of minorities

in USDA programs:

Lack of diversity in the FSA county office delivery
system directly affects participation of minority and
female producers in USDA programs. Underrepresentation
of minorities on county committees and on county staffs
means minority and female producers hear less about
programs and have a more difficult time participating in
USDA programs because they lack specific information on
available services.

However, outreach efforts have failed on a much
broader front than just the county committee system in
FSA. USDA does not place a priority on serving the
needs of small and limited-resource farmers and has not
supported any coordinated effort to address this
problem. The many mission areas and agencies within the
Department have developed their own separate programs
that may or may not be successful in responding to the
real differences in scale and culture presented by
minority and limited-resource customers.

Minority and limited-resource farmers and ranchers reported they are not receiving the technical assistance they require. They said they are not receiving basic information about programs for which they might be eligible. They are not being helped to complete complicated application forms. They are not being helped to understand and meet eligibility requirements for programs. They are not receiving information about how their applications are handled and, if they are denied participation, why they were denied and how they might succeed in the future. When they do receive loans or other program benefits, they are not being helped to use those benefits most effectively to improve their operations.

Some outreach efforts, like the consolidated Service Center approach to providing comprehensive services to USDA customers, have created new barriers. Their locations have not considered the needs of minority and limited-resource customers who may have difficulty in reaching more distant centers than customers with greater resources. Their services have not provided for cultural and language differences that make USDA programs inaccessible or less relevant to minority customer needs. And their services have failed to recognize the different needs of small-scale enterprises, be they farms, businesses, communities, or families. CRAT Report at 26-27.

90. CRAT found that cultural insensitivity interferes with minority participation:

USDA program outreach efforts have not made sufficient use of partnerships with community-based organizations, land-grant and other educational institutions, and program diversity initiatives that understand the specific needs of minority and limited-resource customers. These organizations and institutions can help USDA agencies address discriminatory program rules, develop appropriate special programs, and target outreach in the most effective ways to reach minority communities and other groups with special needs.

Customers at the recent listening sessions reiterated the special needs of different minority and socially disadvantaged communities. All communities agreed that they are overlooked when information is released about available USDA programs. USDA agencies do not make use of minority community organizational and media outlets to be sure all eligible participants know about their programs. Cultural barriers prevent the communication necessary for good service by USDA programs.

Young men and women who want to follow in the family footsteps, either by taking over the family farm or by buying their own, oftentimes find it difficult to obtain financing for their ventures. According to several speakers at the listening sessions, FSA has denied loans to new or beginning farmers despite years of working on their family farm or receiving advanced degrees in agriculture. CRAT Report at 27.

91. CRAT uncovered neglect of and bias against minorities by USDA, resulting in a loss of farmers' land and income.

The recent Civil Rights listening-sessions revealed a general perception of apathy, neglect, and a negative bias towards all minorities on the part of most local USDA government officials directly involved in decision making for program delivery. A reporter at the recent listening session in Tulsa, OK. [sic] observed that minority farmer are not sure which condition "was worse -- being ignored by the USDA and missing potential opportunities or getting involved with its programs and facing a litany of abuses." Minority farmers have lost significant amounts of land and potential farm income as a result of discrimination of FSA programs and the programs of its predecessor agencies, ASCS and FmHA. Socially disadvantaged and minority farmers said USDA is part of a conspiracy to take their land and look to USDA for some kind of compensation for their loses. CRAT Report at 30.

92. CRAT found USDA the fifth worst (of 56 government agencies) in hiring minorities:

According to the US Department of Labor, between 1990 and 2000, women, minorities, and immigrants will account for 80 percent of the United States labor force growth. The "Framework for Change: Work Force Diversity and Delivery of Programs," a USDA report released in 1990, found that USDA had a need to remedy under-representation in its workforce by providing equal employment and promotion opportunities for all employees. When this statement was made, USDA ranked 52 out of 56 Federal agencies in the employment of minorities, women, and individuals with disabilities. CRAT Report at 33.

93. CRAT found that men continue to dominate the best jobs at USDA:

An analysis of USDA's workforce by Professional, Administrative, Technical, Clerical, Other, and Blue Collar (PATCOB) series shows that men continue to dominate the professional ranks in USDA, accounting for over 77 percent of the 28,101 professional positions in USDA.   CRAT Report at 33.

94. CRAT found the lack of diversity at USDA adversely affects program delivery to minorities and women:

USDA's workforce does not reflect the diversity of it customer base.  The lack of diversity in field offices adversely affects program delivery to minority and women customers of USDA.  CRAT Report at 45.

95. CRAT found a lack of resources at USDA to ensure fair and equitable (non-discriminatory) program delivery to farmers:

The Assistant Secretary for Administration is USDA's senior official responsible for civil rights. Although that position has the responsibility for civil rights policy and compliance, it does not have the authority or resources necessary to ensure that programs are delivered and employees are treated fairly and equitably.  CRAT Report at 46.

96. CRAT found enforcement of civil rights at USDA in program delivery lacking:

Another problem with enforcing civil rights in program delivery is fragmentation. Agency civil rights directors have a number of responsibilities. For example, USDA agencies each perform some complaint processing functions. However, the Commission noted that the respective roles of OCRE and the agencies were not clearly defined. The Commission also found that OCRE was providing technical assistance to agencies on civil rights statutes, not proactively, but only when requested. CRAT Report at 51.

97. CRAT found a lack of civil rights specialists and knowledge for <u>program-related</u> civil rights issues at USDA:

The Civil Rights Commission's report on the lack of Title VI enforcement also pointed to USDA's lack of civil rights specialists in program-related civil rights issues. Many of the Department's civil rights resources are devoted to processing of employment discrimination complaints. Of the current staff in the Department's two civil rights offices, two-thirds work on EEO complaints. That means only a small percentage of USDA's civil rights staff works on civil rights issues relating to program delivery. According to the Commission, the 1994 civil rights reorganization was deficient because OCRE did not separate internal and external civil rights issues into separate offices. The Commission predicted that "a probable consequence is that USDA's Title VI enforcement program may suffer as OCRE responds to pressures to improve USDA's internal civil rights program." It recommended that USDA establish "two separate units, with different supervisory staff," one for internal and one for external civil rights issues. CRAT Report at 54.

98. CRAT found defendant's counsel hostile to civil rights, if not racist:

The perception that the Office of the General Counsel [at USDA] is hostile to civil rights has been discussed earlier in this report. OGC's legal positions on civil right issues are perceived as insensitive at the least, and racist at worst. Correcting this problem

is critical to the success of USDA's civil rights program. CRAT Report at 55.

99.   CRAT found defendant's counsel often have no civil rights experience or education:

> However, the CRAT has found that attorneys who practice civil rights law at [USDA's] OGC are not required to have specialized experience or education in civil rights when they are hired.  They acquire their civil rights experience on the job.  In addition, most of OGC's lawyers working on civil rights issues work on non-civil-rights issues as well.  CRAT Report at 55.

100.   In sum, CRAT concluded that defendant does not support or enforce civil rights:

> USDA does not have the structure in place to support an effective civil rights program.  The Assistant Secretary for Administration lacks authority and resources essential to ensure accountability among senior management ranks.  There has been instability and lack of skilled leadership at the position of USDA Director of Civil Rights.  Dividing up the Department's Civil Rights office between policy and complaints has further exacerbated the problem.  The division of responsibility for civil rights among different USDA offices and agencies has left confusion over enforcement responsibilities.  Finally, OGC is perceived as unsupportive of civil rights.  CRAT Report at 56.

101.   Neither the OIG nor CRAT Report thoroughly analyzed any counties where substantial numbers of women, minorities and other protected farmers farm.  However, both reports indicate that the discrimination problems at USDA were not limited to a specific group of farmers but victimized minorities in general.

102.   The magnitude of the problem is greater than reflected in the OIG and CRAT studies.  The process of resolving claims

under the <u>Pigford</u> settlement has shown that literally thousands of discrimination complaints filed at the local level never made it into the FSA/OCREA system.   Further, while the OIG and CRAT reports reviewed the situation prior to 1997, later USDA reports indicate that the problems persist.

103.   On September 29, 1997, USDA's Office of Inspector General issued Phase II of the OIG Report on Civil Rights Issues, entitled "Minority Participation In Farm Service Agency's Farm Loan Programs  - Phase II". (hereinafter OIG Report II)(attached hereto as Exhibit F), which found, inter <u>alia</u> that (a) defendant has resolved only 32 of the 241 outstanding discrimination complaints reported in the OIG Report (back in February, 1997) and (b) that the backlog of discrimination complaints had increased from 241 to 474 for FSA and from 530 to 984 for all of USDA.

104. On September 30, 1998, the USDA's Office of Inspector General released its "Report to the Secretary on Civil Rights Issues – Phase V" ("OIG Report V", attached hereto as Exhibit G), which states, <u>inter</u> <u>alia</u>:

> a.   We found that the Department [USDA], through CR [Office of Civil Rights], has not made significant progress in reducing the complaints backlog.   Whereas the backlog stood at 1,088 complaints on November 1, 1997, it still remains at 616 complaints as of September 11, 1998.   OIG Report V, cover letter to the Secretary.

b.   The backlog is not being resolved at a faster rate because CR itself has not attained the efficiency it needs to systematically reduce the caseload. Few of the deficiencies we noted in our previous reviews have been corrected.  <u>The office is still in disarray, providing no decisive leadership and making little attempt to correct the mistakes of the past.</u>  We noted with considerable concern that after 20 months, CR has made virtually no progress in implementing the corrective actions we thought essential to the viability of its operations.  OIG Report V at i (emphasis added).

c.   Most conspicuous among the uncorrected problems is the <u>continuing disorder within CR</u>.  The data base CR uses to report the status of cases is <u>unreliable and full of error,</u> and the files it keeps to store needed documentation are <u>slovenly and unmanaged</u>. Forty complaint <u>files could not be found,</u> and another 130 complaints that were listed in USDA agency files were not recorded in CR's data base.  <u>Management controls were so poor</u> that we could not render an opinion on the quality of CR's investigations and adjudications.  OIG Report V at iii (emphasis added).

d.   Of equal significance is the absence of written policy and procedures.  OIG Report V at iii.

e.   The absence of formal procedures and accurate records raises questions about due care within the complaints resolution process.  <u>We found critical quality control steps missing at every stage of the process.</u>  Staff members with little training and less experience were put to judging matters that carry serious legal and moral implications.  <u>Many of CR's adjudicators, who must determine whether discrimination occurred, were student interns.</u>  Legal staff members with the Office of General Counsel (OGC), who review CR's decisions for legal sufficiency, have had to return over half of them because they were based on incomplete data or faulty analysis.  We noted that a disproportionately large percent of the 616 cases of unresolved backlog had bottlenecked in the adjudication unit.  OIG Report V at iii (emphasis added).

105. This systemic pattern of inefficiency continues.  As reported On March 10, 2000, by OIG Report VII (Exhibit C, _supra_) which states:

(a)   This is our _seventh_ attempt to provide CR with constructive ways to overcome its inefficiencies.  Based on the results of our review and on the operating environment we observed at CR, we cannot report encouraging news. OIG Report VII, Viadero cover letter at 1.

(b)   Based on the findings of our current review and on CR's poor record of responding to our past recommendations, it is difficult to recognize any significant level of progress. Unless CR implements a management plan that addresses effective leadership, changing organizational culture, customer focus, and process engineering, we question whether future complaints of discrimination in the distribution of program benefits will receive due care.  OIG Report VII, Viadero cover letter at 2.

(c)   Many other critical issues remain unresolved.  Most notably, CR did not reengineer its complaints resolution process.  Although, CR officials had previously agreed that the system they used to process complaints was neither effective nor efficient and although we recommended a major transformation of this system, no significant changes in how complaints are processed have been made.  As a result, we cannot conclude that all complaints are processed with due care. OIG Report VII at i.

(d)   Since February 1997, we have issued six reports on civil rights issues relating to the program complaints process administered by CR.  Those six reports contained 67 recommendations, 54 of which were directed at CR (the remaining 13 were directed at the Farm Service Agency). During the current review, we found that 41 recommendations (all directed at CR) have not been adequately addressed by CR, based on the actions taken as of December 1, 1999.  As a result, we still have concerns that CR may not be providing due care when processing complaints alleging discrimination in USDA programs. OIG Report VII at 14.

106. The Office of the Inspector General cannot report that the USDA Office of Civil Rights has made <u>any</u> meaningful progress -- <u>OIG initiated these corrective measures over three years ago</u> (February 1997).  Furthermore, USDA's inability to even marginally improve its operating procedures shows the Agency's reluctance to adequately address past civil rights violations and ensure that the present system will effectively protect the rights of its farmer constituents.

107.  In sum, defendant's willful disregard of, and failure to properly investigate, discrimination complaints from women, minorities and other protected farmers' began with the disbanding of civil rights enforcement functions back in 1983.  Even after February, 1997, when the current administration reorganized and reestablished the enforcement staff of the civil rights office, the situation has gotten worse, as evidenced by the massive increase of backlogged, unresolved cases and overall disarray in the USDA Office of Civil Rights as reported in the most recent OIG Report.

<u>EQUAL CREDIT OPPORTUNITY ACT AND
ADMINISTRATIVE PROCEDURE ACT</u>

108.   The  Equal  Credit  Opportunity  Act  ("ECOA")  is  a detailed and exhaustive legislative directive unequivocal in its statutory  intent  to  stamp  out  discrimination  by  any  lender,

anywhere, whether private, public, governmental or quasi-governmental.

ECOA states, <u>inter</u> <u>alia</u>:

> It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction – (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract);... 15 U.S.C. § 1691(a)(1).

Second, ECOA provides for monetary relief to both individuals and <u>class</u> <u>members</u> who are damaged by creditors who violate the statute:

> Any creditor who fails to comply with any requirement imposed under this subchapter shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or <u>as a member of a class</u>. 15 U.S.C. § 1691e(a) (emphasis added).

Third, district courts are vested with the authority to provide equitable and declaratory relief under ECOA:

> Upon application by an aggrieved applicant, the appropriate United States district court or any other court of competent jurisdiction may grant such <u>equitable and declaratory relief</u> as is necessary to enforce the requirements imposed under this subchapter. 15 U.S.C. § 1691e(c) (emphasis added).

Fourth, the prevailing party can recover costs and reasonable attorneys fees under ECOA:

> In the case of any successful action under subsection (a), (b), or (c) of this section, <u>the cost of the action, together with a reasonable attorney's fee</u> as determined by the court, shall be added to any damages awarded by the court under such subsection. 15 U.S.C. § 1691e(d) (emphasis added).

109.  In sum, this court has jurisdiction to grant actual damages, equitable and declaratory relief, costs and attorneys fees under ECOA, and ECOA contains a waiver of United States sovereign immunity.

110.  When class members filed discrimination complaints, they fell four-square under the umbrella of ECOA.  It is plaintiffs' belief that ninety-five percent of class members filed complaints of discrimination with respect to USDA's loan application process.  Only five percent have claims for denial of disaster applications.

111.  While ECOA covers farm "credit" programs, but not disaster and other non-credit farm programs, the Administrative Procedure Act provides an avenue of relief for farmers who have been denied equal access to the non-credit programs.

112.  Further, the implementation of USDA's credit programs and the non-credit programs were closely intertwined and the violation of plaintiffs' rights were equally egregious in both areas.  Discrimination existed under both credit and non-credit programs, and neither offered women, minorities and other protected farmers an opportunity to appeal to a civil rights enforcement body to obtain relief.  Further, in many instances, the calculation of loans under the credit program and payments or benefits under the non-credit programs were interdependent.  For example, the amount of non-credit program benefits or program allotments that a farmer could receive for the crop of a commodity (such as cotton, corn, wheat, rice, peanuts, or tobacco) in a year required a review of his or her farming history, which, in turn, was directly related to the yield per acre the farmer cultivated, which was dependent on the amount of operating credit made available to the farmer.

                    STATUTE OF LIMITATIONS IS WAIVED

113.  On October 21, 1998, the President signed into law the Omnibus Consolidated Appropriations Act for Fiscal Year 1999, P.L. 105-277, Div. A, § 101(a) [§ 741], 112 Stat. 2681 (Codified at 7 U.S.C. § 2279). The following provisions of said legislation waive the Statute of Limitations for plaintiffs in this case:

          Sec. [741].  Waiver of Statute of Limitations.

          (a)  To the extent permitted by the Constitution, any civil action to obtain relief with respect to the discrimination alleged in an eligible complaint, if commenced not later than 2 years after the date of the enactment of this Act, shall not be barred by any statute of limitations.

          ...(d)  The United States Court of Federal Claims and the United States District Court shall have exclusive original jurisdiction over

(1) any cause of action arising out of a complaint with respect to which this section waives the statute of limitations; and

(2) any civil action for judicial review of a determination in an administrative proceeding in the Department of Agriculture under this section.

(e)   As used in this section, the term "eligible complaint" means a nonemployment related complaint that was filed with the Department of Agriculture before July 1, 1997 and alleges discrimination at any time during the period beginning on January 1, 1981 and ending December 31, 1996

(1)   in violation of the Equal Credit Opportunity Act (15 U.S.C. 1691, et seq.) in administering

(A)   a farm ownership, farm operating, or emergency loan funded from the Agricultural Credit Insurance Program Account; or

(B)   a housing program established under title V of the Housing Act of 1949; or

(2)   in the administration of a commodity program or a disaster assistance program.

(f)   This section shall apply in fiscal year 1999 and thereafter.

114. In addition, federal legal standards provide for the tolling of any other applicable statutes of limitation applicable to class members in this case whenever a person is induced or tricked into not timely filing a complaint -- such as 1) when the person incorrectly relies on USDA to process an administrative

complaint when, as the OIG notes, USDA remains incapable of doing so in a timely manner; or 2) the person is prevented by extraordinary circumstances beyond his or her control from filing a complaint in a timely manner, such as when a person has a well-founded fear of retaliation against himself or herself for voicing concerns about discriminatory practices in the local area in which he or she lives or farms; or 3) when women have difficulty in voicing gender-related discrimination complaints in the male dominated agricultural community.

CLASS ACTION ALLEGATIONS

115. Plaintiffs bring this Class action on behalf of women, minorities and other protected farmers, who have been discriminated against[4] on the basis of age, sex, marital status, race, color, national origin, or religion[5], for the purpose of asserting the claims alleged in this Complaint on a common basis. Plaintiffs' proposed Class is defined as all women, minorities and other protected participants in FSA's farm programs who <u>petitioned</u> or would have petition had they not been induced, tricked, or otherwise prevented from timely filing a complaint--USDA at any time between January 1, 1981, and December 31, 1999, for relief from acts of discrimination visited on them, as they tried to participate in such farm programs and who, because of the failings in the USDA civil rights complaint processing system described above, were denied equal protection under the laws of the United States and deprived of due process in the handling of their discrimination complaints.

---

[4] Excluding claimants in <u>Pigford v. Glickman</u>, Native American farmers who are class members in <u>Keepseagle v. Glickman</u> and Hispanic and Latino farmers who are class members <u>Garcia v. Glickman</u>.

[5] In the event that this court should determine in our motion for class certification that there is any incompatibility between women and any of the other five protected classes, we reserve the right to separate them into separate class actions.

116.  During the period January 1, 1981 to December 31, 1999, plaintiffs and members of the Class filed discrimination complaints for not less than 3,000 farmers.

117.  This action is brought and may properly be maintained as a Class action pursuant to the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and, as appropriate, 23(b)(1), (b)(2) and/or (b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy and predominance and superiority requirement of those provisions.

118.  <u>Numerosity of the Class. Fed. R. Civ. P. 23(a)(1)</u>.  The Class is so numerous that the individual joinder of all its members is impracticable.  FSA has approximately 2,750 county offices throughout the United States; they process applications for approximately 1,400,000 farmers.  Plaintiffs believe, from plaintiffs' research and travel to county offices throughout the country, interviews with hundreds of women, minorities and other protected farmers and ranchers, and review of defendant's reports, that during the period January 1, 1981, to December 31, 1999, USDA received at least 3,000 discrimination complaints on behalf of class members.  Accordingly, plaintiffs are informed and believe, and on that basis allege, that the Class includes not less than 3,000 members. However, plaintiffs and members of the Class contend that many written complaints of discrimination were never

properly docketed in defendant's "system" and therefore were never acknowledged by or responded to by defendant.  For example, many complaints filed years ago in local and state offices are (because of the publicity generated in <u>Pigford v. Glickman</u>) only now being forwarded to USDA's offices in Washington, D.C.  While plaintiffs believe the minimal number of cases is 3,000, without access to defendant's files, plaintiffs have no further specific knowledge as to the exact number of complaints.  Class members may be informed of the pendency of this Class action by published and broadcast notice; in addition, defendant has each Class member's farm number, address, application date and payment results on computer, and thus readily available.

119.  <u>Existence and Predominance of Common Questions Of Law and Fact. Fed. R. Civ. P. 23(a) and 23(b)(3)</u>.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class. These common legal and factual questions arise from one central issue, which does not vary from Class member to Class member and which may be determined without reference to the individual circumstances of any particular Class member: <u>defendant's institutional and systematic course of conduct in denying civil rights complainants due process of law in the handling of their</u>

complaints.  These common legal and factual questions include, but are not limited to, the following:

a)    Whether    and    when    defendant's officials discriminated against plaintiffs and Class members in failing to process discrimination complaints;

b)    Whether    and    when    defendant's    officials discriminated against plaintiffs and Class members in granting credit and providing other program benefits;

c)    Whether defendant's officials failed to provide plaintiffs and Class members equal opportunity for and access to credit or other program benefits;

d)    Whether defendant's institutional and systematic failure to provide plaintiffs and Class members equal opportunity for and access to credit or other program benefits was arbitrary, capricious, an abuse of discretion, and in excess of statutory jurisdiction;

e)    Whether defendant's actions violated plaintiffs' and Class members' rights under the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a);

f)    Whether plaintiffs and Class members are entitled to (1) a declaration of their eligibility to receive damages or other monetary relief, (2) costs, (3) attorneys fees and (4)

interest from the date they should have been paid to the actual date of payment; and

g)   How any and all payments plaintiffs are declared eligible to receive should be equitably allocated among the Class.

These questions of law as to each Class member arose at the same time - following the release of the OIG Report and CRAT Report, in February, 1997, exposing for the first time, the institutional and systematic failure of the discrimination complaint process at USDA.

120.   <u>Typicality of Claims. Fed. R. Civ. P. 23(a)(3)</u>. Plaintiffs' claims are typical of the claims of the members of the Class, all of whom have been denied equal access to credit or other program benefits and due process in the enforcement of their discrimination complaints, and have been subject to defendant's institutional and systematic failure to enforce the civil rights laws intended to benefit plaintiffs and members of the Class, due to defendant's arbitrary and unlawful actions.

121.   <u>Adequacy of Representation.  Fed. R. Civ. P. 23(a)(4)</u>.

Plaintiffs are adequate representatives of the Class because they are members of the Class and their interests do not conflict with the interests of the members of the Class they seek to represent. They have retained competent counsel experienced in the prosecution of complex agricultural disputes involving review of

adverse agency action, experienced in civil rights litigation, and experienced in class action litigation, and they intend to prosecute this action vigorously for the benefit of the Class. Mr. Pires, after 7 years at the U.S. Department of Justice, has spent 17 years in private practice representing farmers; he has been Lead Counsel in over 50 lawsuits filed on behalf of farmers in federal courts throughout the country.  Mr. Fraas has been in private practice representing farmers for 11 years.  Prior to that, he was Chief Counsel of the House Agriculture Committee, responsible for all USDA programs and laws.  Mr. Pires and Mr. Fraas were Lead Counsel in (1) Pigford v. Glickman, a similar class action lawsuit in which over 20,100 Black farmers are participating under a Consent Decree, (2) Keepseagle v. Glickman, a similar class action lawsuit on behalf of Native American farmers and ranchers, and (3) Garcia v. Glickman, a similar class action lawsuit on behalf of Hispanic American farmers and ranchers.  Mr. Pires and Mr. Fraas are Lead Counsel in this case. Joining them as Of Counsel, are (1) J. L. Chestnut of Chestnut, Sanders, Sanders, Pettaway, Campbell & Albright, a nationally known civil rights lawyer, with 38 years of experience in discrimination law and class action litigation.  Mr. Chestnut is Of Counsel in Pigford, Keepseagle and Garcia; (2) Dennis C. Sweet, III of Langston, Sweet & Freese, is an experienced class action

attorney with extensive experience in discrimination law. Mr. Sweet is Of Counsel in <u>Pigford</u>; and (3) Sarah M. Vogel of Wheeler Wolf Attorneys, is an experienced attorney in the field of agricultural law and has been practicing for nearly 30 years. Ms. Vogel is Of Counsel in <u>Keepseagle.</u> The interests of the members of the Class will be fairly and adequately protected by plaintiffs and their Lead Counsel and Of Counsel. Counsel for plaintiffs have signed retainer agreements with plaintiffs stating that in the event of a successful settlement or judgment (1) <u>100% of all monies received will go to plaintiffs and Class members</u>; and (2) counsel will seek recovery of legal fees, expenses and costs under the Equal Credit Opportunity Act and the Equal Access To Justice Act.

122. <u>Superiority. Fed. R. Civ. P. 23(b)(3)</u>. A Class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual litigation of Class members' claims regarding the defendant's institutional and systematic deprivation of their civil rights as described in this Complaint is impracticable. Even if any Class members could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of the facts of not less than 3,000 cases would proceed. Individual litigation further presents a potential for

inconsistent or contradictory judgments and increases the delay and expenses to all parties and the court system in resolving the legal and factual issues of the case.  By contrast, the Class action device presents far fewer management difficulties and provides the benefits of single adjudication of what essentially is one problem, economies of scale, and comprehensive supervision by a single court.  Notice of the pendency of any resolution of this Class action can be provided to Class members by publication and broadcast; in addition, defendant has each Class member's farm number, address, application date and payment results on computer, readily available.

123.   The various claims asserted in this action are additionally or alternatively certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) and 23(b)(2) because:

a)   The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members, thus establishing incompatible standards of conduct for defendant;

b)   The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of the other Class members not parties to such adjudications or would

substantially impair or impede the ability of such non-party Class members to protect their interests; and

c)   Defendant has acted on grounds generally applicable to the Class, thereby making appropriate final declaratory relief with respect to the Class as a whole.

<u>COUNT I</u>
(Declaratory Judgment)

124.   Plaintiffs, on behalf of themselves and all others similarly situated, re-allege all paragraphs above as if fully set forth herein.

125.   An actual controversy exists between plaintiffs and Class members and defendant as to their rights with respect to defendant's farm programs.

126.   Plaintiffs and the Class pray that this Court declare and determine, pursuant to 28 U.S.C. § 2201, the rights of plaintiffs and Class members under defendant's farm programs including their right to equal credit, equal participation in farm programs, and their right to full and timely enforcement of gender discrimination complaints.

<u>COUNT II</u>
(Violation of Equal Credit Opportunity Act)

127. Plaintiffs, on behalf of themselves and all others similarly situated, re-allege all paragraphs above as if fully set forth herein.

128. Defendant's acts of denying plaintiffs and Class members credit and other benefits and systematically failing to properly process their discrimination complaints was gender discrimination and contrary to the requirements of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a).

129. Plaintiffs and the Class pray defendant's actions be reversed as violative of the Equal Credit Opportunity Act.

130. Plaintiffs and the class pray for money damages for plaintiffs and Class members of $3,000,000,000.

<u>COUNT III</u>
(Violation of the Administrative Procedure Act)

131. Plaintiffs, on behalf of themselves and all others similarly situated, re-allege all paragraphs above as if fully set forth herein.

132. Defendant's acts of denying plaintiffs and Class members credit and other benefits and systematically failing to properly process their discrimination complaints was gender discrimination and contrary to the requirements of applicable law.

133.   Plaintiffs and the Class pray defendant's actions be reversed as arbitrary, capricious, and abuse of discretion, and not in accordance with the law, pursuant to 5 U.S.C. § 706(2)(A), and in excess of defendant's statutory jurisdiction, pursuant to 5 U.S.C. § 706(2)(C).

134.   As a direct and proximate result of defendant's acts, plaintiffs and the Class members sustained damages, including payments rightfully due plaintiffs and the Class members.

135.   Plaintiffs pray for appropriate relief under the Administrative Procedure Act, including (1) compensation to plaintiffs and Class members for there having been no proper investigation of their complaints, and (2) specific performance with respect to their program benefits.

WHEREFORE, plaintiffs, on behalf of themselves and all others similarly situated, request that this Court enter judgment against defendant as follows:

(1)   An Order certifying the Class, and any appropriate subclass thereof, under the appropriate provisions of Fed. R. Civ. P. 23, and appointing plaintiffs (class representatives) and Alexander J. Pires, Jr. and Phillip L. Fraas as Lead Counsel to represent the Class;

(2)   An Order declaring, pursuant to 28 U.S.C. § 2201, that plaintiffs and the Class members were denied equal credit and

other farm program benefits and full and timely enforcement of their civil rights discrimination complaints.

(3)  An Order declaring defendant's actions to be a breach of plaintiffs' rights under the Equal Credit Opportunity Act and the Administrative Procedures Act and declaring plaintiffs and the Class members eligible to receive monetary and other relief of not less than $3,000,000,000.

(4)  An Order granting plaintiffs' and the Class members' attorneys' fees and expenses pursuant to the Equal Credit Opportunity Act, and the Equal Access to Justice Act, costs of suit, and interest from date when plaintiffs and the Class members should have been paid to actual date of payment, and all other relief that the Court determines proper and fair.

                         Respectfully submitted,

October 19, 2000      By:  _____
                         Alexander J. Pires, Jr. #185009
                         CONLON, FRANTZ, PHELAN & PIRES, LLP
                         1818 N Street, N.W., Suite 700
                         Washington, D.C.  20036
                         (202) 331-7050

                      By:  _____
                         Phillip L. Fraas #211219
                         TUTTLE, TAYLOR & HERON
                         1025 Thomas Jefferson Street, N.W.
                         Washington, D.C.  20007
                         (202)342-1300

                         Lead Counsel for Plaintiffs

<u>Of Counsel</u>:

J. L. Chestnut
CHESTNUT, SANDERS,SANDERS,
PETTAWAY, Campbell & Albright,
P.C.
1 Union Street
Selma, Alabama   36701
(334) 875-9264

Dennis C. Sweet, III

Langston, Sweet & Freese
201 N. President Street
Jackson, Mississippi 39201
(601) 969-1356

Sarah Vogel
WHEELER WOLF ATTORNEYS
220 North Fourth Street
Bismarck, ND 58502-2056
(701) 223-5300